Silsby *v.* Trotter.

---

## John Silsby

### *v.*

## Charles W. Trotter.

1. A contract simply giving a right to take ore from a mine, no nterest or estate being granted, merely confers a license.

2. Under such licenses the licensee acquires no right to the ore until he separates it from the freehold.

3. If a mining license is coupled with an interest growing out of expenditures made by the licensee pursuant to its requirements, it is not revocable at the pleasure of the licensor.

4. When a license merely gives the licensee a right to dig and take ore, it is not exclusive of the licensor, but he may take ore from the same mine, at the same time, and grant permission to others to do so.

5. But an exclusive right may be conferred by license, and where it clearly appears, even by implication, that it was the mutual design of the parties to make it exclusive, it will be held to be exclusive.

6. A licensee who constructs a tunnel for mining purposes, under the authority of his license, with his own funds, for which he is to be reimbursed out of the licensor's share of the profits of ore mined for the joint benefit of the licensee and licensor, will be held to have an exclusive right to the use of the tunnel, so far as such use is necessary to enable him to get the ore he has a right to take, provided he uses reasonable diligence in taking it.

---

On motion to dissolve injunction, heard on bill, answer and affidavits.

*Messrs. R. Wayne & Cortlandt Parker*, for motion.

*Mr. Robert Gilchrist, contra.*

The Vice-Chancellor.

The dispute in this case grows out of conflicting claims made by the litigants to the use of an adit or tunnel leading to a deposit of franklinite ore, in Stirling Hill, Sussex county, which both claim a right to mine and remove by means of the adit or tunnel. Both parties derive their rights from the Franklinite Steel and Zinc Company. The question of the case is, What is the extent of the rights of the respective parties in the adit or tunnel? The defendant's rights arise out of the following contracts: On the 28th of April, 1874, the Franklinite Steel and Zinc Company, by writing, gave the defendant, Mr. Trotter, the right and privilege, for seven years from that date, to enter into and upon the lands containing the ores which both parties claim a right to dig and take, for the purpose of mining and taking therefrom ten thousand gross tons of carbonate of zinc, silicate of zinc and red oxide of zinc, at least one-seventh of the whole quantity to be mined and taken in each year. Mr. Trotter agreed to pay $10 a ton, and also to open and work the mine properly, and mine the ores at his own cost and expense, but it was further agreed that such cost and expense should be deducted from the price of the ores. The agreement further provides, that the tools, implements and property used in opening and working the mine shall be the property of the corporation, and that they shall be entitled to the possession of them when Mr. Trotter ceases to have a right to work the mine; and that Mr. Trotter's operations shall be conducted under the direction of a mining engineer selected by the corporation. The corporation reserves the right to mine and furnish the ores to which Mr. Trotter is entitled, in which case no deduction for the cost and expense of mining is to be made from the price; and they also reserve the right to work the

mine concurrently with Mr. Trotter, when their working will not interfere with his. It is further stipulated, that a failure by Mr. Trotter to keep his covenants shall, at the option of the corporation, work a forfeiture of his rights under the contract.

By a subsequent contract, bearing date November 4th, 1875, Mr. Trotter is given the right and privilege to take, in addition to the quantity specified in the first contract, ten thousand tons of zinc ore, of the same kind mentioned in that contract, and at the same price; and he is also given four years additional time within which to mine and remove it, with a proviso that he shall mine and remove one-fourth of such additional quantity in each of the four additional years.

By another contract, bearing date September 1st, 1876, Mr. Trotter is given the right, for the period of one year from that date, to mine and sell, or mine and manufacture, silicate of zinc taken from the mine and tunnel, and, as a consideration for such right, he agrees to keep accurate accounts of the value of the ore, and of the costs and expenses, and ascertain and divide the profits equally between the corporation and himself, and to credit the corporation's share of the profits on their portion of his expenditures on account of the mine. By a recital in this contract, the corporation admits the contract of April 28th, 1874, had been performed by Mr. Trotter, so far as it was practicable for him to do so.

By a further contract, bearing date September 14th, 1876, the corporation give and grant unto Mr. Trotter the right and privilege of entering into and upon the same lands described in the first contract, and into, through and from either side of the tunnel made by him there, to mine and take out forty thousand tons of franklinite ore; and, in consideration of such grant, Mr. Trotter binds himself to furnish all the labor and capital necessary to mine and sell the forty thousand tons of ore, to keep accurate accounts of his transactions, to make an advance of $1,950 to the corpora-

tion at stated periods, and to ascertain and divide the profits equally with the corporation, paying part of their share to them at periods specified, and applying another part to the amount due to him for the construction of the tunnel, and to reimburse him for his advances.

It will thus be seen that Mr. Trotter's rights were : first, to take ten thousand tons of the three different kinds of zinc ore—carbonate, silicate and red oxide—within seven years from April 28th, 1874, one-seventh, at least, of the whole quantity to be taken in each year; second, to take ten thousand tons additional, of the same kinds of zinc ore, during the four years immediately succeeding the expiration of the seven, one-fourth of the additional quantity to be taken in each of the four years; third, to take any quantity of silicate of zinc which he could mine and sell, or mine and manufacture, during a period of one year from September 1st, 1876; fourth, to take from either side of the tunnel forty thousand tons of franklinite; and, fifth, to be reimbursed for his advances to the corporation, and to be paid for certain outlays made by him in opening and working the mine.

On the 22d of March, 1877, the Franklinite Steel and Zinc Company made a lease to the complainant, whereby they granted and demised to him, for a term of twenty-one years, all the veins, lodes and beds of franklinite contained in, upon and beneath the surface of the lands described in the contracts with Mr. Trotter, and also in, upon and beneath the surface of other lands, and all the spurs, dips and angles of said veins, lodes and beds of franklinite ; and also, all their estate, right, title, interest, property, claim and demand of, in and to the same; but the lessors expressly reserved rights and privileges of precisely the same nature and to the same extent as are held and possessed by Mr. Trotter under the contracts of April 28th, 1874, and September 1st, 1876; and also, all the rents, issues and profits which might or should arise out of the rights and privileges so reserved.

Prior to the execution of the lease to the complainant, Mr. Trotter, under his contracts with the corporation, had, in opening the mine, constructed, under the direction of a mining engineer selected by the corporation, the tunnel in controversy, at a cost, as he claims, of over $15,000, and laid a railroad track upon its bed. It is used as a way to and from the mine, principally for the transportation of ore from the point where it is separated from the vein or deposit to the place of shipment. It is not the only means of access to the mine; in addition to it, there is a pit or hole, extending from the surface to the mine, seventy feet in depth and twenty by thirty feet in area. The complainant says this pit or hole was made several years ago in mining franklinite, and is now used for light and air, and that it would not be a practical way of mining to raise ore through it.

On the 3d of May, 1877, on a bill alleging that Mr. Trotter was exercising his privileges slothfully and inefficiently; that he was not working the mine nor using the tunnel to the full extent of their capacity, and that both could be operated much more extensively without interfering with Mr. Trotter's operations; that the complainant had made market for a large quantity of franklinite at remunerative prices, which he would lose if he was excluded from the mine and prevented from using the tunnel; that he had earnestly but unsuccessfully endeavored to effect an amicable arrangement with Mr. Trotter, who, in a spirit of mere perversity, had refused to allow him to use the tunnel to any extent whatever, an injunction was granted, enjoining Mr. Trotter from preventing the complainant from using the tunnel contemporaneously with him, to such extent as would not interfere with him in conducting mining operations similar in extent to those theretofore carried on by him. Mr. Trotter has answered this bill, and now moves to dissolve the injunction.

The contracts merely grant a right to take ore; no estate or interest is granted; and therefore they simply give a license, but it is a license coupled with an interest growing

out of expenditures made pursuant to its requirement, and it cannot therefore be revoked at the pleasure of the licensor.

The authorities are agreed that a license to dig and take ore is never exclusive of the licensor, unless expressed in such words as to show that that was the intention of the parties. Where the license simply gives the licensee the right to dig and take ore, the licensor may take ore from the same mine, at the same time, and also grant permission to others to exercise the same right. This seems to have been the prevailing rule upon the subject since *Mountjoy's Case*, decided during the reign of Queen Elizabeth, of which several, not entirely harmonious, reports have been preserved. The curious may find them in *Anderson* 307, 4 *Leonard* 147, *Co. Litt.* 164(c), *Godbolt* 17, and *Moore* 174. In that case such license was held to be like a grant of common *sans nombre*, which never excludes the grantor from enjoying the common with his grantee. In *Chetham* v. *Williamson*, 4 *East* 469, 476, Lord Ellenborough declared, " a liberty reserved of digging coals could not give the person reserving it the exclusive right to them. No case can be named where one who has only a liberty of digging for coals in another's soil has an exclusive right to the coals, so as to enable him to maintain trover against the owner of the estate for coals raised by him." And in *Grubb* v. *Bayard*, 2 *Wall. Jr.* 81, where the license gave the licensee the right to dig and carry away *all the iron ore to be found* in certain designated lands, it was held there was no grant of the ore, but the licensee merely had the right to take away so much as he might dig. The word " all " was held to show merely the extent of his license as to quantity ; he was at liberty to dig all the ore there was in the land, but he acquired no title to any until he separated it from the freehold. His license conferred a right without stint as to quantity, but, like a grant of a right of common *sans nombre*, it did not exclude the grantor. Views identical in substance are expressed in *Funk* v. *Haldeman*, 53 *Pa. St.* 229, and in *Stockbridge Iron Company* v. *Hudson Iron Company*, 107 *Mass.*

290, 322. The latest statement of this doctrine, by an English judge, I have been able to find, is by Lord Justice Page Wood, in *Carr* v. *Benson, L. R. (3 Ch. Ap.)* 524. He says: "It has been held from the earliest period, that a man taking a license where he is under no obligation to work, cannot exclude his licensor from granting as many more licenses as he thinks fit; provided, always, that they are not so granted as to defeat the known objects of the first licensee in applying for his license."

Upon these authorities I take it to be entirely clear that Mr. Trotter did not acquire an exclusive right to the occupancy of the mine. The more difficult question is, What are his rights in the tunnel? It must be regarded as a way to the mine. Had Mr. Trotter built it at his own cost, under the authority of his license, I think his right to the use of it would have been exclusive, so long at least as it was necessary for him to have the exclusive use of it to carry out his purpose in constructing it. Though there had been no express stipulation to that effect, such an exclusive right would have arisen by unavoidable implication from the very nature of the transaction. No sensible man would incur such an expenditure unless he understood his rights were to be exclusive, and no honest man would encourage so large an outlay unless he intended that the person making it should have the exclusive enjoyment of it, so long at least as it was necessary to enable him to accomplish his purpose in making it. But that is not the case presented for judgment. While Mr. Trotter furnished all the capital expended in the construction of the tunnel, it was advanced by him as a loan to his licensors; he is entitled to reimbursement. This right is secured by the contracts and fully admitted in the bill. It must be conceded, then, the tunnel was built by Mr. Trotter for his licensors, and constituted part of the "tools, implements and property used in opening and working the mine," which, under the contract of April 28th, 1874, became their property, subject, however, to an exclusive right of possession in Mr. Trotter,

provided the extent of his operations made such possession necessary, and his licensors did not elect to mine and furnish him with the ores he had a right to take. That contract provides that "the tools, implements and property used in opening and working the mine shall be the property of the party of the first part, which party shall be entitled to the possession of the same when the party of the second part shall cease to have any right to work the mine under the contract; the party of the first part reserves the right to mine and furnish to the party of the second part the ores he is authorized to take under the contract, and also the right to work the mine, whenever by so doing it will not interfere with the actual working thereof by the party of the second part." It is obvious, I think, the right to work the mine must be defined to be not merely digging ore, but removing it from the mine, so that the licensors have, under this reservation, the right to use the tunnel whenever their use of it will not materially obstruct the use of it by the licensee; but I think it is equally clear, that the parties intended that the licensee should have a right, if his operations required it, to absorb the whole use of the tunnel, and in that case that his possession should be exclusive. This construction is made absolutely necessary by the stipulation that the licensor's use of the tunnel shall be only such as will not interfere with the use of it by the licensee. Precedence and superiority of right are conceded to the licensee. Although the two subsequent contracts, the first dated November 4th, 1875, and the second September 1st, 1876, relate to the same kind of ores, and in a certain sense may be considered supplemental to the first, yet it is important to observe they contain no reservation giving the licensors a right to furnish ore to the licensee, and there is nothing apparent on their face from which such right can be implied. The last, the license to take franklinite, contains no reservation authorizing the licensors to furnish ore in the place of that which the licensee is authorized to take. Unlike all the others, the time within which the licensee is to

take the forty thousand tons of franklinite is not limited by express words, but while this is so I think it quite clearly appears from those portions of the contract which require monthly advances to be made to the licensors, upon which they are to be charged interest, and which also provide for the payment of those advances and the cost of the tunnel out of the licensor's share of the profits, and designate when the profits shall be divided and paid, that the parties intended and distinctly understood that the mine should be worked continuously to its full capacity, so long as a remunerative market for the ore could be had. It was an arrangement for working the mine for the reimbursement of one and for the profit of both, which could not be made fully and presently effectual unless the mine was worked to the full extent of its capacity.

If such is the true construction of the contract—and that, in my view, is the interpretation it must receive—there can be no doubt, I think, that Mr. Trotter's right to the use of the tunnel must be held paramount and exclusive, so long as he works the mine to the full extent of its capacity. Any other view would defeat the purpose of the contract as to the one party or the other. If, in this case, the licensors had first constructed the tunnel at their own cost, and then, for a sufficient consideration, granted a license authorizing the licensee to take a certain quantity of ore within a time limited, and it appeared the licensee could not get the full quantity of ore he was entitled to, within the time designated, unless he had the exclusive use of the tunnel, I take it to be entirely clear his right, in that case, would be held to be exclusive. If it were not, it would always be in the power of a licensor to defeat his grant, even when his license was coupled with an interest, or founded on a good consideration. An exclusive right to mine may be raised by implication, but it must be so clear and strong as to be unavoidable. *Funk* v. *Haldeman, supra.*

The complainant occupies the same position here his lessors would, were they seeking judicial aid. The lease

Silsby *v.* Trotter.

gave him full notice of the rights and privileges of the defendant, and he can claim no equity which his lessors could not have invoked had they been the complainants.

So far as the present record shows, neither carbonate of zinc nor red oxide of zinc has been found, but a very large quantity of franklinite has been discovered. Silicate of zinc has also been found, but the defendant says its quality is so poor as to render it nearly worthless as a mineral. The bill and affidavits show the mine contains many hundred thousand tons of franklinite. That is the chief subject-matter of the strife, and the tunnel is mainly valuable now to the parties because it affords a convenient way for removing the ore from the mine to the place of shipment.

My conclusions are:

First—That both parties are entitled to the use of the tunnel, but the right of the complainant is subordinate to that of the defendant.

Second—That until the complainant is able to furnish the defendant with the zinc ores he is entitled to under the contract of April 28th, 1874, and until he gives him notice of his election to do so, the defendant has an exclusive right to the use of the tunnel so long as his operations in the mine render the exclusive use of the tunnel necessary to him.

Third—That when the complainant is able and has notified the defendant of his election to mine and furnish to him the zinc ores he is entitled to under the contract of April 28th, 1874, he will be entitled to the exclusive use of the tunnel for the purpose of furnishing those ores, and for that purpose only, for such time, in each year, as shall be necessary to afford him a fair opportunity to furnish to the defendant the quantity of ore deliverable to him in that year.

Fourth—That at all times when the defendant's mining operations do not render the exclusive use of the tunnel necessary to him, the complainant shall be permitted to use it to such extent as will not interfere with the defendant's use of it.

Fifth—That whenever the defendant shall suspend work temporarily, or his mining operations do not render the use of the tunnel necessary to him, the complainant shall, for such period as the defendant does not need its use, have the entire use of the tunnel.

The injunction must be so modified as to conform to the foregoing conclusions. If it becomes necessary for the protection of the parties in the enjoyment of their respective rights as herein defined, a manager of the tunnel will be appointed.